IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:15cr103

DEMARL T. STEWART

### MEMORANDUM OPINION

This matter is before the Court on the defendant's *pro se* Letter Motion for Compassionate Release (ECF No. 36), the DEFENDANT'S SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT AND MEMORANDUM IN SUPPORT (ECF No. 45) and the United States' Response in Opposition to Defendant's Motion for Compassionate Release (ECF No. 49). For the reasons set forth below, defendant's *pro se* Letter Motion for Compassionate Release (ECF No. 36) and the DEFENDANT'S SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT AND MEMORANDUM IN SUPPORT (ECF No. 45) will be denied.

### BACKGROUND

On September 28, 2015, Demarl Tyrone Stewart pled guilty to distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1). On January 13, 2016, Stewart was sentenced to a term of

imprisonment of 155 months to be followed by three years of supervised release.[1]

Through an investigation begun in 2015, the Richmond Police Department determined that Stewart was selling cocaine base. The police officers, through confidential informants, conducted controlled purchases on April 16, April 22, and April 30, 2015. The purchase amounts were .63 grams of cocaine base, .89 grams of cocaine base, and .74 grams of cocaine base, respectively, on the above cited dates. On May 8, 2015, a search warrant of Stewart's residence produced 3.7 grams of cocaine base, packaging material, and sets of scales.

According the Presentence Report in this case (ECF No. 39, Stewart has previous convictions for possession with intent to distribute cocaine base. In the first case, he was sentenced to 33 months of imprisonment. He was released from the Bureau of Prisons on June 26, 2009. In 2010, Stewart was again arrested (while on supervised release) for distribution of cocaine base. He was convicted on that charge and sentenced to 21 months of imprisonment and three years of supervised release. He was released from federal prison on that conviction on February 9,

---

[1] At the same time, based on the conviction in this case, Stewart was also found to be in violation of supervised release in 3:10cr260 and 4:13cr114. He was sentenced to 24 months of imprisonment for those violations of supervised release. That sentence was to be served concurrently to his sentence in this case.

2

2014. While serving a previous sentence in a rehabilitation facility, Stewart escaped and was convicted in 2014 of that offense and was sentenced to time served (163 days) and to three years of supervised release. The conviction in this case was Stewart's third conviction for a drug trafficking offense.

Stewart submitted a request for compassionate release to the Warden of FMC Lexington where he is currently serving 155 months of imprisonment. He has served approximately 46% of that term. The Warden denied Stewart's request for release and Stewart submitted a second request on June 17, 2020 noting that he had a long history of migraine headaches and the severity thereof had increased after he had been exposed to COVID-19 while in prison. That request was also denied.

Stewart has contracted and recovered from COVID-19 and fortunately he was asymptomatic. He has since received both doses of the Moderna vaccine. Although Stewart mentions that he is experiencing more severe migraine headaches than before he contracted COVID-19, he claims no other medical condition as a basis for his request for compassionate release. Instead, Stewart bases his request for compassionate release also on the ground that he has been rehabilitated as is evidenced by the fact that he has not committed any disciplinary violations while in prison and that, while serving his sentence, he has completed a number of classes, a 200 hour vocational course, is enrolled in a business

3

management course, and is serving in an administrative capacity in the Accounts Receivable Department with Unicor. He also seems to say that his race is a reason for granting compassionate release.

As of the date the Government filed its papers in this case, FMC Lexington had 1,163 inmates, of which none had tested positive for COVID-19. Also, two staff members had tested positive for COVID-19. Stewart cites the same figures. It does not appear to be disputed that, since May 2020, nine inmates had died from COVID-19 related reasons at FMC Lexington. The record also says that previously 707 inmates and 78 inmates at FMC Lexington had tested positive for COVID-19 but had since recovered.

It is also not disputed that, as of the date of the Government's papers, 600 inmates and 319 staff members had been inoculated against COVID-19.

## DISCUSSION

The applicable statute, 18 U.S.C. § 3582(c)(1)(A), provides, in pertinent part, that, upon appropriate motion, the Court "may reduce the term of imprisonment . . . if it finds that 'extraordinary and compelling reasons' warrant such a reduction." It is settled that the burden is on the defendant to prove that extraordinary and compelling reasons exist for compassionate release under § 3582(c)(1)(A)(i). United States v. White, 378 F. Supp.3 784, 785 (W.D. Mo. 2019).

4

The "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering the Bureau of Prison's statutory role, and extensive professional efforts to curtail the virus' spread. United States v. Raia, 954 F.3d 594, 597 (3rd Cir. 2020). In assessing whether the record shows the existence of extraordinary and compelling reasons for compassionate release, courts consider, inter alia, the guidance of the CDC, and non-binding policy statements of the United States Sentencing Guidelines. See United States v. Beck, 425 F. Supp. 3d 573, 581-82 (M.D.N.C. 2019). The policy statements are not binding but are informative and may be considered. United States v. McCoy, 981 F.3d 271, 276 (4th Cir. 2020). The cases teach that, to constitute extraordinary and compelling reasons for compassionate release, medical conditions must be serious. Also, it is generally true that "chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020).

To establish existence of "extraordinary and compelling" reasons for compassionate release because of COVID-19, the defendant must show "both a particularized susceptibility to the disease and a particularized risk of contracting the disease at [his] prison facility." United States v. Feiling, 453 F. Supp.3d

5

832, 840 (E.D. Va. 2020); <u>United States v. White</u>, ____ F. Supp.3d ____, 2020 WL 1906845, at *1 (E.D. Va. April 23, 2020)

### 1. Particularized Susceptibility

Stewart has not established that he suffers from any medical condition recognized by the CDC (or otherwise) as increasing the risk of adverse consequences if he once again contracts COVID-19. He claims only that the migraine headaches from which he suffered before contracting COVID-19 (an asymptomatic case) have worsened.

But, if Stewart had met his burden, the law is clear that a defendant who has established a higher susceptibility to COVID-19 does not resolve the particularized susceptibility requirement. That is because identified risk factor conditions must be serious to constitute extraordinary and compelling reasons. It appears from the record that Stewart's migraine condition is a "chronic condition that can be managed in prison [and thus is] not a sufficient basis for compassionate release." <u>United States v. Ayon-Nunez</u>, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020). Stewart has not established that his medical needs cannot be met while incarcerated.

Moreover, Stewart, like almost all inmates at FMC Lexington, has been fully vaccinated with the Moderna vaccine. The vaccine has proven effective in reducing both the risk of contracting COVID-19 and the risk of serious consequences if it should be contracted. That fact, the high level of those vaccinated at FMC

6

Lexington, and the de minimus number of cases reported at FMC Lexington, viewed in perspective of the record about Stewart's claimed health conditions, strongly operate to preclude a finding that the particularized susceptibility test is met here.

In sum, Stewart has not met the particularized susceptibility risk facet of the applicable test.

### 2. Particularized Facility Risk

Nor has Stewart met the particularized facility risk component of the appropriate test. His motion cites press releases and information respecting the instances of COVID-19 among inmates and staff at BOP facilities nationwide, but provides no real evidentiary support of a particularized risk of contracting the disease at FMC Lexington, Stewart's facility of incarceration. Further, the record reflects that, at the time of the filing of the Government's papers, FMC Lexington had no active case of COVID-19 among inmates, two active cases of COVID-19 among staff, and 707 inmates and 78 staff members who had previously recovered from COVID-19.

On this record, and considering the vaccination record at FMC Lexington, and Stewart's vaccination, Stewart has not met the particularized facility component of the applicable test.[2]

---

[2] That is true even considering the nine deaths reported at FMC Lexington because the record does not explain the circumstances of the deaths.

7

### 3. Assessment Under 18 U.S.C. § 3553(a)

But, even if Stewart had met the particularized risk assessment and the particularized facility assessment (which he has not), it would be appropriate to deny compassionate release in perspective of the sentencing factors prescribed by 18 U.S.C. § 3553(a). Compassionate release, of course, is appropriate only where the defendant is not a danger to the safety of any other person or of the community. Stewart argues that he is not a danger to the community. That, he says, is largely because: (i) his offense of conviction was not a violent crime; (ii) he has no record of infractions while in prison; and (iii) he has bettered himself while in prison. (ECF No. 45, p. 16).

Stewart's argument ignores the fact that, before incarceration for this offense, he had demonstrated a continued disregard for the law by committing serious offenses and committing them while he was on supervised release, returning to criminal conduct only shortly after having been released from prison. Nor does his position take proper account of the seriousness of the offenses of conviction (although he acknowledges that the conduct was serious) because this conviction was for the same kinds of conduct for which he had been previously convicted and for which he had received relatively lenient sentences, thereby illustrating that a lengthy term of imprisonment is necessary to protect the

8

public and to deter the defendant from returning to similar conduct.

Thus, the nature and consequences of the offense of conviction aspect of § 3553(a) counsels strongly against compassionate release. As does the nature and characteristics of the defendant. Those factors taken together teach that Stewart is a convicted career offender. His sentence (at the low end of the guideline) is sufficient but not greater than necessary to accomplish protection of the public, deterrence of the defendant and others, and to promote respect for the law.

Stewart has taken educational courses and has become employed in the prison system, all of which is helpful to his rehabilitation. That effort toward rehabilitation is highly commendable, but considering Stewart's record of recidivism, the record does not show that Stewart will not return to his criminal ways. And, in any event, the commendable rehabilitation efforts do not outweigh the seriousness of the offense or Stewart's serious criminal history.

Stewart also argues that, because he is African-American, he is more vulnerable to COVID-19. That, in reality is an argument that COVID-19 pandemic has affected the African-American and other minority populations disproportionately. Without definitive proof, it is fair to say that general reports of the impacts of COVID-19 tend to bear out that assertion. However, notwithstanding

9

the disproportionate impact, it is also true that a defendant's race "does not constitute a risk factor for COVID-19 in the same way an underlying medical condition does." United States v. Jackson, No. 05-20018-01-JWL, 2020 WL 5231317, at *3 (D. Kan. Sept. 2, 2020). Indeed, there is really no support for the proposition that "race," qua race, increases a person's risk for contracting COVID-19 or experiencing severe illness if it is contracted. As the Government argues, there seems to be a consensus emerging that racial and ethnic disparities in the rates of contracting, and in the adverse outcome of, COVID-19 most likely are attributable to "social determinants of health" that "have historically prevented" minority groups "from having fair opportunities for economic, physical, and emotional health." Health Equity Considerations and Racial and Ethnic Minority Groups, CDC (Apr. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcorona-virus%2F2019-ncov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html. Put another way, as the Court held in United States v. Dimkpa, "[w]hile ethnic minority groups may be more affected by the coronavirus pandemic, current evidence suggests a correlation, not causation." United States v. Dimkpa, No. 1:19cr443, 2020 WL 4754901, at *2 (M.D.N.C. Aug. 17, 2020)

10

For those reasons, most courts have decided that race, qua race, is not an extraordinary and compelling reason for compassionate release. United States v. Leigh-James, No. 3:15cr188 (SRU), 2020 WL 4003566, at *8 (D. Conn. July 15, 2020) (collecting cases); United States v. Wilson, No. CCB-14-334, 2020 WL 4286873, at *2 (D. Md. July 27, 2020).

Also, Stewart argues that his age is a factor that counsels in favor of a grant of compassionate release. That is a strange argument for Stewart to make considering that, when he was sentenced he was only 29 years old and that he, even now, is approximately 35-1/2 years old. On this record, certainly the age argument carries no weight.

Finally, Stewart argues that the fact that he previously contracted COVID-19 puts him at a greater risk of serious consequences. Whatever merit might be to that argument were Stewart not vaccinated,[3] the argument has no currency now that he is fully vaccinated. That is particularly so given that the case of COVID-19 that he did contract was an asymptomatic one.

---

[3] And, there seems to be no record on the point other than that Stewart (with the antibodies produced from his bout with COVID-19) is less likely to contract COVID-19.

11

## CONCLUSION

For the reasons outlined above, the defendant's *pro se* Letter Motion for Compassionate Release (ECF No. 36), the DEFENDANT'S SUPPLEMENTAL MOTION FOR COMPASSIONATE RELEASE PURSUANT TO SECTION 603(b) OF THE FIRST STEP ACT AND MEMORANDUM IN SUPPORT (ECF No. 45) will be denied.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June 8, 2022